A04A1957, A04A1958. ALLEN et al. v. HARKNESS STONE
COMPANY, INC.; and vice versa.
(609 SE2d 647)

ELLINGTON, Judge.

Following a bench trial in the State Court of Gwinnett County, Robert M. Allen and his company, Exterior Expressions, Inc., appeal from the judgment in favor of Harkness Stone Company, Inc., on Allen's counterclaim for unpaid rent due under a leasehold agreement and for attorney fees and costs of litigation. Allen contends the court erred in requiring him to mitigate damages. Harkness Stone cross-appeals from the judgment in favor of Allen on all but one of its claims,[1] contending the trial court erred in construing the terms of a shareholder buyout agreement at issue in this case. Finding no reversible error in either case, we affirm.

"We review appeals from bench trials, where the trial judge sits as trier of fact and has the opportunity to assess witness credibility, under the clearly erroneous standard. Therefore, the trial court's findings of fact will not be disturbed if there is any evidence to support them." (Citation and punctuation omitted.) *Harper v. Foxworthy, Inc.*, 254 Ga. App. 495, 495-496 (562 SE2d 736) (2002). However, the "plain legal error" standard of review applies when the issue on appeal is one of law, not fact. *Page v. Braddy*, 255 Ga. App. 124, 126 (564 SE2d 538) (2002). So viewed, the record shows the following.

Robert Allen owns Exterior Expressions, Inc., a commercial contractor of exterior stonework installations. Around 1993, Allen became acquainted with John Harkness, a stone supplier. In 1997, Allen purchased land in Gwinnett County and constructed a new building on it to accommodate his offices and to store stone for his projects. Upon seeing the new building, Harkness contacted Allen and suggested they open a stone yard there together. In May 1997, Allen and Harkness formed Harkness Stone Company, executed a shareholder's agreement, and became equal shareholders in the stone yard. Allen leased a portion of his new building to Harkness Stone for $2,400 a month for a term of ten years. Exterior Expressions purchased most of the stone for its projects from Harkness Stone. It was Harkness Stone's largest customer, representing about 20 percent of its sales. After just three months, the stone yard "took off" and became very profitable.

---

[1] Harkness Stone sued Allen for breach of contract, unpaid accounts, attorney fees, exemplary damages, defamation of title, fraud, and unjust enrichment. Harkness Stone prevailed on only one of these claims, that for payment of its unpaid accounts.

In the fall of 1997, Exterior Expressions' business operations took Allen out of state more frequently and he was unable to participate fully in the stone yard. Therefore, he offered to sell his shares of Harkness Stone to Harkness. He wrote a letter to Harkness proposing to sell his shares of the business for $175,000, financed according to terms similar to those they had already agreed on in their shareholder agreement. Harkness wanted to buy Allen's shares, but suggested the purchase price be financed through the lease so that he could claim the payments as a business expense. Allen agreed.

On October 2, 1997, Allen and Harkness executed a "Shareholder Buyout Agreement" that the two had drafted, apparently without the assistance of an attorney. The agreement did not explicitly state a sales price for Allen's shares of Harkness Stone. Instead, the buyout was predicated upon several related terms. One term provided that "John Harkness agrees to sign [a] new lease effective Nov. 1, 1997." The buyout agreement also required Harkness (1) to execute and make scheduled payments on two new promissory notes, one for $36,915 and one for $6,200, (2) to continue selling stone to Exterior Expressions at specified prices to be reviewed annually, (3) to load and unload Exterior Expressions' trucks, and (4) to assume certain expenses of the stone yard. Allen testified that the promissory notes were to memorialize debts Harkness already owed and were not a part of the sales price. The agreement also provided that "[a]ll shares will be returned to Robert M. Allen upon default of any part of this agreement. This includes any default on [the] lease." The new commercial lease agreement was revised to require rental increases which, over the term of the lease, totaled $160,800. Allen testified that he accepted the rental increases as the sale price for his stock. The lease prohibited assignment and subletting without Allen's written consent; however, the lease also provided that consent "shall not be unreasonably withheld." The shareholder buyout agreement, the promissory notes, and the lease were executed contemporaneously.

In October 1998, John Harkness died suddenly. His wife, Cynthia Bastin, inherited Harkness Stone. Although she had no experience running a stone yard, she stepped in as president on a temporary basis while she and a business broker attempted to find a buyer for the company. On April 14, 1999, a group of buyers reached a preliminary agreement to purchase Harkness Stone's assets. An assignment of the pre-existing lease was a condition of the sales agreement. Allen testified that before he assigned the lease (or agreed to sign a new lease), he needed to see his prospective tenants' credit reports and financial statements. He wrote Bastin: "I will need financial statements on all parties concerned in order to sign a new lease." Despite several requests, neither Bastin's broker nor the buyers sent him the

financial information sought. Allen testified that he wanted to make sure any prospective buyer had the financial ability to assume the lease and to protect his buyout agreement. Bastin and the attorney for her husband's estate, however, were under the impression that Allen had already received payment for his shares, that the buyout agreement had expired, that Allen had no continuing interest in Harkness Stone, and that his consent to the assignment was unnecessary. They interpreted the shareholder buyout agreement requiring the execution of new promissory notes to be the purchase price for Allen's stock.

As Bastin attempted both to run the business and to market it for sale, her relationship with Allen deteriorated. Allen testified that he was frustrated by Bastin's failure to abide by certain terms of the buyout agreement and lease, like loading and unloading his trucks, selling stone to him at agreed prices, and maintaining the leasehold property in good repair. Bastin and her attorney, however, testified that Allen was hostile toward them, threatened to put them out of business, and "nickled and dimed" them whenever he could. One witness, a former employee of Harkness Stone, testified that Allen became extremely bitter and characterized Bastin as his enemy.

It is undisputed that at some point during Bastin's negotiations with the prospective buyers, Allen stopped paying Harkness Stone's invoices. Allen testified he withheld payment because of inaccuracies in the invoices. Bastin and her probate attorney testified that Allen's failure to pay was punitive and that it ultimately forced them out of business. At the time Harkness Stone went out of business, Allen had unpaid accounts totaling $74,183.01. Bastin also testified that she believed Allen's conduct cost them the sale of Harkness Stone to the potential buyers. The buyers testified that the sale fell through because they had concerns about whether they would in fact acquire the entire business. It also appears, however, they may have been unable to secure financing.

After Harkness Stone vacated Allen's building, Allen re-leased a portion of the premises to Exterior Expressions for $2,000 per month. Allen had previously informed the potential buyers that "a fair lease amount" for the space was $5,500 per month. He then demanded $176,000 from Harkness Stone for past due and future rent, an amount that represented the difference between what Harkness Stone would have owed under the lease less what Allen was collecting from Exterior Expressions.

Harkness Stone sued Allen for breach of contract, unpaid accounts, attorney fees, exemplary damages, defamation of title, fraud, and unjust enrichment. Allen counterclaimed for rent due under the lease, for damages to the premises, and for attorney fees. After a bench trial, the trial court found in favor of Allen on all but one of

Harkness Stone's claims, the claim for unpaid accounts. The court found that Allen owed Harkness Stone $65,440.11 on those accounts for stone it had received. The judge found in favor of Harkness Stone on all of Allen's counterclaims.

## Case No. A04A1957

1. Allen contends the trial court erred in finding in favor of Harkness Stone on his counterclaim for unpaid rent.[2] Allen argues that the trial court erred in assuming he and his company were required to "present sufficient evidence of their mitigation of damages." "Without saying so," Allen argues, the trial court "apparently relied upon the general principle of contract law that a non-breaching party has an obligation to mitigate damages caused by the breaching party," citing OCGA § 13-6-5. Allen claims this finding is plain legal error because a landlord is not obligated to mitigate damages in a suit for rent due under a commercial lease.

In Georgia, if a tenant abandons leased premises without authorization prior to the expiration of the term, the landlord is not required to mitigate damages by reletting the premises. *Shaheen & Co. v. Dickson*, 207 Ga. App. 328, 329 (427 SE2d 825) (1993). Rather, he may allow the premises to remain vacant and hold the tenant responsible for accruing rent. Id. This rule applies, however, only if the landlord refuses to accept the tenant's offer of surrender and the lease remains in full force. "[I]f the landlord accepts the tenant's surrender or the tenant successfully terminates the lease, the landlord is required to make reasonable efforts to re-lease the premises and mitigate his damages. See Wilburn, Ga. Law of Damages § 28-15.4 (1994)." *Ga. Color Farms v. K.K.L., L.P.*, 234 Ga. App. 849, n. 1 (507 SE2d 817) (1998). See also Dawkins, Ga. Landlord & Tenant, Breach & Remedies, 3rd ed., § 7-9, p. 229.

In this case, there was evidence from which the court could find that Harkness Stone "successfully terminated the lease." OCGA § 13-4-23 provides that "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." Bastin and other witnesses testified that Harkness Stone abandoned the premises and stopped paying rent only because the company was forced out of business when its landlord and largest customer, Allen, refused to pay for stone it had received. Allen admitted he did not pay his invoices and the trial court found that Allen owed Harkness Stone

---

[2] Allen asserts no error in the trial court's ruling in favor of Harkness Stone on Allen's counterclaim for damages to the premises.

over $65,000 in unpaid accounts. This evidence establishes a connection between Allen's conduct and Harkness Stone's business losses and resultant inability to pay rent. It would be sufficient to show that Harkness Stone's nonperformance was excused and the lease, therefore, successfully terminated.[3] See *Market Place Shopping Center v. Basic Business Alternative*, 213 Ga. App. 722, 723 (2) (445 SE2d 824) (1994). Given this record evidence, we find no error in the trial court's conclusion that Allen was required to present evidence in mitigation of his leasehold damages.

2. Because Allen was not a "prevailing party" on any of his counterclaims, he was not entitled to attorney fees and costs of litigation pursuant to the terms of his lease contract. *Magnetic Resonance Plus v. Imaging Systems Intl.*, 273 Ga. 525, 528 (3) (543 SE2d 32) (2001).

## Case No. A04A1958

3. In its cross-appeal, Harkness Stone contends the trial court, in finding in favor of Allen on its claims, erred "in holding that the duration of the shareholder buyout agreement was controlled by the lease."[4] Harkness Stone points to that portion of the buyout agreement setting forth terms of repayment on one of the promissory notes and argues that "John Harkness was to make three payments for the stock. If, prior to the final payment, he defaulted on the buyout agreement or the lease (which was also financing the sale), the shares were to be returned to appellant Allen. Upon the third payment, the buyout agreement was completed." This argument is untenable for many reasons.

The shareholder buyout agreement does not state a sales price for Allen's shares nor does it provide whether the lease or the promissory notes (or both or either) constituted the purchase price for the sale of Allen's stock. The shareholder agreement is patently ambiguous in this respect. Moreover, the agreement does not contain an ending date nor does it explicitly state when Allen's shares vest absolutely in Harkness Stone. In fact, although Harkness Stone argues that the buyout was completed when the promissory notes were paid off, it simultaneously acknowledges that the lease, which had a ten-year duration, financed the sale of stock — as Allen's unrebutted testimony established. Moreover, the buyout agreement

---

[3] Although the trial court did not explicitly make these findings in its order, they arguably are implicit in the court's analysis and final judgment.

[4] The trial court, in concluding that Allen "received no other payments for his shares" other than those incorporated into the lease, made an incidental finding that "[t]he [shareholder buyout] Agreement and the Lease are thus linked and run for the same period of time."

contains several terms that required continuous, future performance for an unspecified period, like loading and unloading Exterior Expressions' trucks and annually reviewing stone costs. And, most significantly, the agreement provided that all of Allen's shares in the business would be returned to him upon "default of any part of this agreement. This includes any default on [the] lease." It is undisputed that the lease had a ten-year term and the lease agreement was executed contemporaneously with the buyout agreement.

The trial court was authorized to construe the lease and shareholder buyout agreements together as multiple documents executed during the course of a single transaction. OCGA § 24-6-3 (a); *Duke v. KHD Deutz of America Corp.*, 221 Ga. App. 452, 453 (471 SE2d 537) (1996). Further, neither the "plain language" of the buyout agreement nor the most favorable rules of statutory construction support Harkness Stone's argument that the buyout agreement was complete when the promissory notes were paid off. There is simply no evidence to support such a construction. In fact, the court's finding that the agreement was "linked" to the lease's ten-year term upholds the contract as a whole, reflects the parties' intent as expressed in the testimony and documentary evidence offered at trial, and is supported by "[a]ll the attendant and surrounding circumstances" proved in this case. See OCGA §§ 13-2-2 (1), (4); 13-2-3. Consequently, we find no error.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED DECEMBER 14, 2004 —
RECONSIDERATION DENIED JANUARY 26, 2005 — 

*Gambrell & Stolz, Robert G. Brazier, Kevin A. Stine, Seaton D. Purdom*, for appellants.
*David L. Whitman, Sandra D. Hicks*, for appellee.